**Arthur J. FARMER, Plaintiff–Appellee,**

v.

**Ray MABUS, as Governor of the State of Mississippi, Defendant–Appellant.**

No. 91–1274.

United States Court of Appeals, Fifth Circuit.

Aug. 20, 1991.

Stephen J. Kirchmayr, Jr., Robert E. Sanders, Asst. Attys. Gen. and Mike Moore, Atty. Gen., Jackson, Miss., for defendant-appellant.

Shirley Payne and Dennis L. Horn, Horn & Payne, Jackson, Miss., for plaintiff-appellee.

Before REYNALDO G. GARZA, POLITZ, and JONES, Circuit Judges.

POLITZ, Circuit Judge:

Ray Mabus, the governor of Mississippi, appeals an adverse grant of declaratory and injunctive relief in favor of Major General Arthur J. Farmer,[1] the Adjutant General of the Mississippi National Guard, enjoining the governor from continuing to deny General Farmer the exercise of executive authority over the state National Guard. Concluding that the issue is not justiciable in a federal forum and that the matter was thus improvidently considered by the district court, we vacate its judgment and dismiss the complaint.

*Background*

In January of 1990, Governor Mabus became aware through local press reports that General Farmer had purchased interests in land adjacent to the National Guard training center at Camp Shelby, Mississippi, during a time when expansion of Camp Shelby was under consideration. As Commander–in–Chief of the Mississippi National al Guard,[2] the governor reprimanded the

---

1. General Farmer is state-recognized as a major general; he is federally-recognized as a brigadier general.

2. Miss.Code Ann. § 33–13–1. The Mississippi National Guard is composed of its headquarters staff and both the Mississippi Army National Guard and the Mississippi Air National Guard.

general, directed that he divest himself of the property, and referred the matter to the State Ethics Commission.

A few weeks later the governor took additional action, assuming "direct control over the day-to-day operations" of the state Military Department and appointing Brigadier General Charlie Denver Brackeen as his Special Advisor for Military Affairs. The governor ordered General Farmer to coordinate with General Brackeen on a daily basis respecting all aspects of his duties as adjutant general, and to make weekly reports on his duty-related plans for the next week. Lieutenant General John B. Conaway, who as Chief of the National Guard Bureau heads the joint entity of the Departments of the Army and the Air Force charged with administration of the National Guard system nationwide, wrote General Farmer advising that the Bureau was aware of the governor's actions and was working directly with him.

On March 5, 1990 the governor ordered General Farmer to delegate all of his "authority under 32 U.S.C. 708 with respect to technician matters and authority to sign documents concerning such 'FOR THE ADJUTANT GENERAL' to Brigadier General Charlie D. Brackeen...." One week later, the governor directed the general to vacate his Military Department office and report for duty with the Emergency Management Agency, relieved him of all duties pursuant to Army Regulation 570–4,[3] forbade him from performing flight duties, and directed that he return the state vehicle and credit cards he had been issued as Adjutant General.

In a March 13 letter to General Brackeen, General Farmer "reluctantly" delegated all of his authority as per instructions from the governor. A typographical error was corrected in a subsequent letter dated April 6. General Farmer's letters both closed with a notation that "This delegation of authority shall remain in effect until specifically revoked in writing by me."

On April 18, 1990 General Farmer wrote a letter informing "all whom it may concern" that as of the following day he was "reasserting [his] authority as The Adjutant General, Mississippi National Guard." His six-paragraph letter stated that his 40 years in service to his state and country had trained him to obey the orders of his superiors without hesitation, but that the research of "independent legal counsel" suggested that he "should either reassert [his] authority or resign." Contending that his love for the Guard and respect for the Mississippi Senate precluded the latter, he chose the former.

Explaining his legal theory, the general's letter continued:

> To allow someone else to perform my duties while I remain legally responsible for their actions under both State and Federal law jeopardizes both the integrity of Federal funding for the Mississippi National Guard and my position as Adjutant General.
>
> I am revoking any prior delegations of authority made by me, and I will perform the duties and obligations imposed upon me by State and Federal law. Not to reassert my authority as Adjutant General would be in dereliction of these duties.

On April 19 the general attempted to return to his former office but was ordered to vacate same by Lieutenant Governor Brad Dye, acting in the stead of the absent governor. When the general refused he was removed by officers of the state highway patrol acting on orders of Governor Dye.

The general brought the instant action in the Southern District of Mississippi seeking a judgment declaring that until properly removed he possessed the federal and state authority to oversee the day-to-day operations of the Mississippi National Guard. He further sought a preliminary and permanent injunction restraining the governor from impeding his performance of duties. Both parties agreed that there were no material issues of fact and each sought summary judgment.

Shortly thereafter, charges were brought against the general in a pretrial general court-martial proceeding held pursuant to

---

**3.** This regulation is entitled "Manpower Management."

the Mississippi Code of Military Justice, Miss.Code Ann. § 33–13–1 *et seq.* The general was formally suspended with pay from his position as adjutant general. Following the formal investigation the governor ordered that a court-martial be convened.[4] The general moved the district court to enjoin the court-martial proceedings; the court denied that motion.

After the district court declined to intervene, the military judge dismissed the charges against the general, essentially finding that the governor had exerted undue command influence in that the court-martial appeared to be in retaliation for the filing of the instant complaint. That ruling was on appeal to the Mississippi Court of Military Appeals when the case at bar was submitted on appeal to this court.[5]

In issuing its memorandum opinion on summary judgment the district court considered several issues, including justiciability, standing, availability of due process claims, the degree of deference due the National Guard Bureau's approval of the governor's actions, and the extent to which an adjutant general is granted federal powers. The district court reached the merits of the dispute and resolved same by rendering a declaratory judgment and ordering injunctive relief in favor of General Farmer. 757 F.Supp. 1462. The governor timely appealed. The district court denied the governor's request for a stay of its judgment; a panel of this court granted that stay pending the governor's appeal. The matter was presented on briefs and oral argument and submitted for decision.

### Analysis

The foregoing factual scenario might appear to be more at home in the plot of a class B movie about a fictional *coup d'etat*

in a third world country than to present-day happenings in a sovereign state, but the jurisprudential issues raised are of constitutional proportions. We are keenly aware that judicial intrusion into military matters is to be most cautiously and charily approached. This perception is the product of the profound realization that the judicial process is manifestly ill-suited for resolution of most of the myriad disputes which arise in that field. *Gilligan v. Morgan,* 413 U.S. 1, 10, 93 S.Ct. 2440, 2446, 37 L.Ed.2d 407, 415 (1973) ("It would be difficult to think of a clearer example of the type of governmental action that was intended by the Constitution to be left to the political branches directly responsible—as the Judicial branch is not—to the electoral process. Moreover, it is difficult to conceive of an area of governmental activity in which the courts have less competence.").[6]

Whereas the present appeal poses, *inter alia,* inquiries into whether: (1) the general has standing; (2) the eleventh amendment bars the result reached by the trial court; and (3) a suspension with pay constitutes a constitutional deprivation of a property right, we need reach and decide only the threshold inquiry of justiciability. If the dispute presented is not justiciable in a federal court we may proceed no further.

Our relatively recent holding on the justiciability of National Guard-related disputes, *Crawford v. Texas Army National Guard,* 794 F.2d 1034 (5th Cir.1986), largely guides today's decision. In *Crawford* we rejected the compensatory and equitable claims of 12 national guardsmen who contended that they had been dismissed or placed in the inactive (and unpaid) reserve in retaliation for reporting criminal and discriminatory activity within the Texas Army National Guard. Review of the Supreme Court's rejection of *Bi-*

---

**4.** Miss.Code Ann. § 33–13–175 confers upon the governor the authority to convene a general court-martial. A formal investigation must be completed before court-martial charges may be preferred.

**5.** General Farmer contends that the dismissal is non-appealable, based on Rule 6 of Practice and Procedure of the Mississippi Court of Military Appeals ("The accused shall be the appellant in all cases."). The only evidence of these Rules in

the record indicates their promulgation pursuant to Miss.Code Ann. § 33–13–417(1)(b) on November 1, 1990, the same day, apparently, as the military judge's dismissal of the charges. We do not reach that issue in today's disposition.

**6.** Experience teaches that the converse is equally true. *Cf. Ex Parte Milligan,* 71 U.S. (4 Wall.) 2, 18 L.Ed. 281 (1866).

*vens*-type [7] actions by military personnel in *Chappell v. Wallace*, 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983), and of its reaffirmation of the *Feres* [8] doctrine in *United States v. Shearer*, 473 U.S. 52, 105 S.Ct. 3039, 87 L.Ed.2d 38 (1985), led the *Crawford* court to the conclusion that the guardsmen's suit for money damages was barred.

> The principle expressed in these cases is that civilian courts may not sit in plenary review over intraservice military disputes. Following *Chappell* and *Shearer*, there can be little doubt that the permissible range of lawsuits by present or former servicemen against their superior officers is, at the very least, narrowly circumscribed.

*Crawford*, 794 F.2d at 1035 (footnote omitted). We categorically rejected section 1983 compensatory relief for national guardsmen in view of the exclusive remedies which the services offer for redress of grievances.

The claim for injunctive relief in the nature of reinstatement in the Texas National Guard was also denied. The *Crawford* court examined various military-related cases [9] and concluded:

> The common characteristic of these decisions is that they involve challenges to the facial validity of military regulations and were not tied to discrete personnel matters. The nature of the lawsuits, rather than the relief sought, rendered them justiciable.... We therefore believe that suits for injunctive relief, like those for monetary damages, must be carefully regulated in order to prevent intrusion of the courts into the military structure.

794 F.2d at 1036–37. General Farmer asks us to uphold just such an intrusion. His suit is little more than a direct attack on a personal order of the Mississippi National Guard commander-in-chief. While the courts occasionally have been willing to examine the lawfulness of induction or discharge, *Geyen v. Marsh*, 775 F.2d 1303 (5th Cir.1985), decisions internal to the chain of command require much greater deference, lest we soon find ourselves mired in the nigh-impossible task of judicially reviewing each order or directive issued by lawful military authority. As Justice Jackson incisively opined in the frequently quoted passage in *Orloff v. Willoughby*, 345 U.S. 83, 93–94, 73 S.Ct. 534, 539, 97 L.Ed. 842, 849 (1953):

> We know that from top to bottom of the Army the complaint is often made, and sometimes with justification, that there is discrimination, favoritism or other objectionable handling of men. But judges are not given the task of running the Army. The responsibility for setting up channels through which such grievances can be considered and fairly settled rests upon the Congress and upon the President of the United States and his subordinates. The military constitutes a specialized community governed by a separate discipline from that of the civilian. Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters. While the courts have found occasion to determine whether one has been lawfully inducted and is therefore within the jurisdiction of the Army and subject to its orders, we have found no case where this Court has assumed to revise duty orders as to one lawfully in the service.

The keen effort by the general's able counsel to recast this dispute as an interne-

---

**7.** *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

**8.** *Feres v. United States*, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950).

**9.** *Chappell; Goldman v. Weinberger*, 475 U.S. 503, 106 S.Ct. 1310, 89 L.Ed.2d 478 (1986) (Jewish officer's free exercise-based challenge to Air Force regulation prohibiting wearing headgear indoors rejected); *Brown v. Glines*, 444 U.S. 348,

100 S.Ct. 594, 62 L.Ed.2d 540 (1980) (reaching merits of and rejecting attack against Air Force regulation requiring prior approval for soliciting petition signatures); *Frontiero v. Richardson*, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973) (overturning sex-based discriminatory administration of quarters allowances for servicemembers' dependents); *Ogden v. United States*, 758 F.2d 1168 (7th Cir.1985) (upholding injunction against free speech-abridging off-limits regulation).

cine political struggle in Mississippi, rather than a military personnel matter, adds little force to his invocation of the protection of the federal civil courts. While we have concluded that the dispute essentially presents a military question, the state law issues of the discharge of the adjutant general and the propriety of the court-martial charges and ruling thereon are not fit grist for the federal section 1983 mill.

We therefore hold that the district court erred in concluding that this matter was justiciable in a federal forum and that it improvidently reached the merits and entered an injunction. Accordingly, we VACATE the judgment of the district court and DISMISS the complaint. The matter is REMANDED for entry of an appropriate judgment consistent herewith.