832 A.2d 987

**Galen E. KISE**

v.

**DEPARTMENT OF MILITARY and Veterans Affairs and the Adjutant General of Pennsylvania.**

**Appeal of Department of Military and Veterans Affairs.**

Supreme Court of Pennsylvania.

Submitted Nov. 14, 2002.

Decided Sept. 25, 2003.

---

530

532

Mary Catherine Frye, Harrisburg, for amicus curiae U.S. Department of Justice.

Eclemus Wright, Kenneth Scott Roy, Michael Clark Barrett, James M. Sheehan, Annville, for Department of Military and Veterans Affairs.

Edward George Smith, Wendy Ann Nicolosi, for Galen E. Kise.

Before CAPPY, Cheif Justice, and CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and LAMB, JJ.

## *OPINION*

Justice SAYLOR.

In this appeal, we consider the availability and appropriate breadth of state appellate review of a military personnel action in the form of an involuntary separation for cause from the "Active Guard/Reserve" program of the Army National Guard and Army Reserve.

For fifteen years, Appellee Staff Sergeant Galen Kise ("Kise") served as an enlisted member of the National Guard of the United States ("NGUS") and the Pennsylvania Army National Guard ("PAARNG)",[1] on full-time active service pursuant to Section 502(f), Title 32, of the United States Code, 32 U.S.C. § 502(f), as part of the Active Guard/Reserve ("AGR")

1. Under the National Guard's dual enlistment scheme, a soldier enlists both in the federal organization, serving in a reserve capacity to the United States Army, and in the organized state militia, here, the Pennsylvania National Guard. *See generally Perpich v. Department of Def.*, 496 U.S. 334, 345, 110 S.Ct. 2418, 2425, 110 L.Ed.2d 312 (1990). The United States Supreme Court's decision in *Perpich* discusses at length the justification for and history of this dual system. *See id.* at 340–46, 110 S.Ct. at 2422–26.

program. The AGR is instituted and administered by, and subject to the direction of, the federal government; its purpose is to provide highly qualified officer and enlisted personnel to support the Army National Guard and Army Reserves, generally in positions related to organizing, administering, recruiting, instructing or training. *See* Army Regulation ("AR") 135–18, at ¶¶ 1–5, 3–1(c). *See generally United States ex rel. Karr v. Castle,* 746 F.Supp. 1231, 1237 n. 4 (D.Del.1990) ("The AGR program created a new status of military personnel dedicated to the full-time support of the National Guard[;][t]he creation of the AGR program is part of an increasing emphasis on the use of Reserves to augment active forces."), *modified,* 768 F.Supp. 1087 (D.Del.1991). During his service in the AGR, Kise was paid by the federal government, wore the uniform of the active United States Army, and was subject to numerous regulations promulgated by the federal Department of the Army and the adjunct of it and the Department of the Air Force, the National Guard Bureau.

Effective in May of 2000, Kise was separated from AGR service for cause (asserted misconduct) by order of the Adjutant General of Pennsylvania (the "Adjutant General"), following an investigation conducted pursuant to the provisions of AR 15–6, and National Guard Regulation ("NGR") 600–5.[2] Pursuant to the regulations, Kise received notice of the investigation report and was permitted to submit a written response with the assistance of counsel from the Judge Advocate General's Corps; however, the regulations do not require a hearing as a prerequisite to separation, and none was afforded to Kise. Parenthetically, according to the Adjutant General, no action was taken to remove Kise from his position in PAARNG, of which he apparently remained an active member.

Kise subsequently filed a petition for review in the Commonwealth Court pursuant to Section 763 of the Judicial Code, 42 Pa.C.S. § 763, and Chapter 15 of the Pennsylvania Rules of

2. NGR 600–5 is a federal regulation promulgated by the National Guard Bureau under the authority of the Secretaries of the Army and Air Force. *See* NGR 600–5.

Appellate Procedure, governing direct appeals from Commonwealth agencies, together with an application for a stay. Kise contended, *inter alia*, that he was not advised of the predicate claims of wrongdoing or permitted to participate in the military's investigation; the investigation and separation determination were fraught with error and lacking in due process; and the Adjutant General abused his discretion in concluding that Kise had engaged in misconduct and violated NGR 600–5. Kise therefore requested that the separation order be set aside.

In response, the Commonwealth of Pennsylvania, Department of Military and Veterans Affairs and the Adjutant General (collectively, the "Department") filed a motion to dismiss Kise's petition for review. The Department contended that the separation was federal in nature and therefore beyond the jurisdiction of the state courts, as the Adjutant General acted in a federal capacity, pursuant to federal regulations, to terminate the participation of a federal employee in a military program subject to pervasive federal regulation. Further, the Department addressed the requirement of the Pennsylvania Rules of Appellate Procedure that it certify a record in connection with the appeal, *see* Pa.R.A.P.1952, via an affidavit from the Adjutant General indicating that relevant documents were of a federal character and subject to corresponding national retention directives. The Adjutant General attested that he had asked the responsible federal officials to provide such documentation as could be made available to the court within the bounds of the applicable federal laws and regulations. Various documents were then provided by the PAARNG human relations officer, including the report of investigation, Kise's rebuttal, documentation reflecting various official reviews and recommendations, and a record of the Adjutant General's approval of Kise's separation.

Initially, the Commonwealth Court granted the stay requested by Kise, via single-judge order. Subsequently, Kise filed a petition for adjudication of civil contempt, contending that the Department violated the stay order by failing to restore him to his full-time AGR position. Following argu-

ment, however, the Commonwealth Court denied relief on the contempt petition and vacated the stay, again by single-judge order, citing serious concerns regarding its jurisdiction. Subsequently, the *en banc* Commonwealth Court considered the motion to dismiss and issued a divided opinion and order denying the relief requested by the Department, directing the Department to certify an adequate record, and indicating the court's intention to conduct merits review of several of the issues implicated by Kise's appeal. *See Kise v. Department of Military and Veterans Affairs,* 784 A.2d 253 (Pa.Cmwlth. 2001).

The majority opened its discussion by noting that the Commonwealth Court previously had exercised jurisdiction over an adjudication of the Department challenged by a National Guard soldier, *see id.* at 255 (citing *Prewitt v. Department of Military Affairs,* 686 A.2d 858 (Pa.Cmwlth.1996)); however, it also observed that the availability and scope of state appellate jurisdiction as concerns the administration of the AGR program had not been addressed in that opinion. *See id.* In its evaluation of jurisdiction, the majority first addressed whether a member of the National Guard serving in the AGR program is a federal, as opposed to a state, employee. In this regard, the majority examined the National Guard's dual enlistment scheme, in which, as noted, a soldier enlists both in the National Guard of the United States and the state militia, *see Kise,* 784 A.2d at 255 (citing Maj. Michael E. Smith, *Federal Representation of National Guard Members in Civil Litigation,* 1995–DEC ARMY LAW. 41, 42–43; *see also supra* note 1, and highlighted that, at any particular time, the member serves in one or the other of these capacities, rather than functioning in both simultaneously. *See Kise,* 784 A.2d at 255 (citing *Perpich,* 496 U.S. at 348, 110 S.Ct. at 2426–27 ("[T]he members of the State Guard ... must keep three hats in their closets—a civilian hat, a state militia hat, and an army hat—only one of which is worn at any particular time."))). The majority observed that most duty assignments performed by National Guard members (weekend drills, annual training, and most training and other assignments within

the United States), denominated "Title 32 duty," is undertaken in a state status directed by the Governor, albeit that it is paid for with federal funds. *See Kise*, 784 A.2d at 255 (citing Maj. Grant Blowers, *et al., Disciplining the Force—Jurisdictional Issues in the Joint and Total Force*, 42 A.F.L.REV. 1, 8 (1997)). Furthermore, it distinguished strictly federal service that is ordered by the President or the Secretary of the Army under the authority of federal laws, "Title 10 duty," such as basic military training, overseas training missions, and mobilization of the National Guard by the United States Government. *See id.*

The Commonwealth Court majority concluded that Kise's status in the AGR was as a member of the state militia and not as a federalized soldier; therefore, at the time of his discharge, Kise was a state employee. In this respect, the Commonwealth Court cited, *inter alia*, the salient Army regulation, *see* AR 135–18, ch. 3–1.c (June 19, 1996) ("Personnel of the ARNGUS serving an AGR tour under the provisions of 32 U.S.C. § 502(f)(2) . . . serve in a State status."), and commentary associated with relevant legislative amendments, *see* H.R.Rep. No. 691, 98th Cong., 2d Sess. pp. 242, 243 (1984), *reprinted in* 1984 U.S.C.C.A.N. 4174, 4201–4202 ("The Congress has always intended that [National Guard personnel serving in a full-time duty status] should remain under the control of State National Guard authorities rather than the federal government."). The majority also determined that the Adjutant General acted in a state capacity in separating Kise from the AGR program, based on the Adjutant General's position as a Commonwealth official. Although acknowledging the Adjutant General's responsibility to administer federal laws and regulations, the majority nonetheless deemed it controlling that this is accomplished pursuant to state law authorization. *See Kise*, 784 A.2d at 258–59.

Next, the majority rejected the Department's contention that, since Kise's cause of action is based on federal regulations, jurisdiction over his claims resides exclusively in the United States district courts, reasoning that, under the national scheme of dual sovereignty, state courts are competent to

adjudicate claims arising under the laws of the United States, so long as they are not expressly divested of jurisdiction by an affirmative act of Congress. *See id.* at 258 (citing *Yellow Freight Sys., Inc. v. Donnelly,* 494 U.S. 820, 823, 110 S.Ct. 1566, 1568, 108 L.Ed.2d 834 (1990)). Finding no such express divestiture, the majority concluded that it was free to consider Kise's petition for review under the provisions of the Judicial Code pertaining to appeals from Commonwealth agencies subject to the Administrative Agency Law, 2 Pa.C.S. §§ 101–754. *See* 42 Pa.C.S. § 763(a)(1). The majority also determined that Kise's constitutional rights were implicated by his separation from the AGR. Although recognizing the doctrine of at-will employment prevailing in the Commonwealth, the majority nevertheless found that applicable regulations set forth in NGR 600–5 functioned as a "quasi-contract of continued employment," guaranteeing Kise would not be prematurely terminated from the AGR, absent cause. *Kise,* 784 A.2d at 259–60, 263.

Responding to the Department's argument that judicial involvement in the matter would represent inappropriate interference in military affairs, the majority next considered the justiciability of Kise's petition. In this regard, the majority purported to apply the Third Circuit's test for justiciability of military matters. It read this doctrine as requiring merits review of constitutional claims of service members absent a rare case in which finding for the plaintiff "require[s] a court to run the military." *Kise,* 784 A.2d at 261 (quoting *Jorden v. National Guard Bureau,* 799 F.2d 99, 110–11 (3d Cir.1986) (citation omitted)). Thus, it explained that, "[i]f the military justification outweighs the infringement of the plaintiff's individual freedom, we may hold for the military *on the merits,* but we will not find the claim to be non-justiciable." *Kise,* 784 A.2d at 261 (quoting *Jorden,* 799 F.2d at 110–11 (citation omitted; emphasis in original)). Applying this standard, the majority concluded:

> Whether the procedures used by the Pennsylvania Adjutant General deprived a state employee of Constitutional due process is not a question of military expertise or one that

causes interference with the military mission. This Court is not being called upon to intrude into any issues of military doctrine or other matters committed to the expertise of military commanders. Rather, we are asked to determine whether a State agency transgressed the Constitutional rights of one of its employees. The issues on appeal are justiciable.

*Kise,* 784 A.2d at 261–62 (footnotes and citations omitted).

The Commonwealth Court majority, however, rejected the proposition that Kise was entitled to a due process hearing prior to his discharge under the hearing-related provisions of Pennsylvania's Administrative Agency Law. *See* 2 Pa.C.S. § 504. While taking into account expressions of concern regarding the limited degree of participation required to be afforded in connection with separations from full-time reserve programs, *see Kise,* 784 A.2d at 262 (citing, *inter alia,* John A. Wickham, *The Total Force Concept, Involuntary Administrative Separation, and Constitutional Due Process: Are Reservists on Active Duty Still Second Class Citizens?,* 2000–OCT ARMY LAW. 19, 29), the majority deemed the state courts preempted under the Supremacy Clause of the United States Constitution, U.S. CONST. art. VI, cl. 2, from reliance on the Administrative Agency Law as a source grounding a requirement of a due process hearing. *See Kise,* 784 A.2d at 263. Accordingly, the majority found that its consideration of questions of procedural regularity was strictly limited to those arising under the United States Constitution and NGR 600–5.

Finally, the majority addressed a series of additional issues raised in Kise's petition for review, including claims that: the Adjutant General abused his discretion by failing to address considerations required by applicable regulations to be included in an involuntary separation inquiry; Kise's commander or supervisor failed to counsel or issue a required letter of reprimand concerning Kise's alleged misconduct before initiating his separation; the evidence cited in the investigative report and used to demonstrate an improper relationship between Kise and two other soldiers was insufficient and incompetent; and military rules prohibiting fraternization did

not apply to Kise's relationship with soldiers not in his chain of command. The majority, however, found that its ability to address those issues was impaired on account of the Department's failure to certify and submit an adequate record in accordance with Rule of Appellate Procedure 1952. *See Kise*, 784 A.2d at 264. For example, the majority indicated that the Department should have identified specific military regulations violated by Kise and provided an explicit definition for each of the bases for separation, namely, inappropriate professional conduct and moral dereliction. *See id.* at 264–65. Accordingly, the Commonwealth Court remanded the matter to the Department with instructions to supply a record sufficient to permit effective appellate review.

The dissent took the position that the Commonwealth Court lacked jurisdiction to consider the merits of the petition for review, because the matter involved an appeal by a federal employee from a decision of a federal agency. *See Kise*, 784 A.2d at 265–66 (Pellegrini, J., dissenting). The dissent also observed that the federal dynamic involved in military separations deprived the court of meaningful enforcement authority. *See id.* at 266 (reasoning that, "not only is there evidence that this is a federal matter, but regardless of what this court orders, we cannot force the federal government to pay for or approve Kise's active duty status[;][c]ourts should not enter orders they cannot enforce"). Additionally, the dissent admonished that courts should not interfere in military decisions. *See id.*

■ We allowed appeal to consider questions of first impression concerning judicial review of a military personnel decision by the National Guard concerned with separation of an AGR soldier. Our review of the legal questions involved is plenary. Presently, the Department filed a brief furthering the argumentation that it proffered in the Commonwealth Court; Kise, however, has made no submission to this Court.

■ In its opinion in this case, the Commonwealth Court accurately described the National Guard as a state agency, under state control, and available for state service, yet as also

an organization that is provided for by federal law, part of the armed services the United States, and subject to being called into federal service at any time. *Accord Perpich,* 496 U.S. at 345, 110 S.Ct. at 2425; *Johnson v. Orr,* 780 F.2d 386, 388 (3d Cir.1986). This blending of federal and state indicia results from the National Guard's grounding in both the Militia and the Armies Clauses of the United States Constitution,[3] and is corollary to Congress' decision to incorporate the National Guard into a "total forces concept," designed to ensure national readiness for military conflict. *See Dukakis v. United States Dep't of Def.,* 686 F.Supp. 30, 34 (D.Mass.1988) (quoting Frederick Bernays Wiener, *The Militia Clause of the Constitution,* 54 HARV. L.REV. 181, 208 (1940)). *See generally Perpich,* 496 U.S. at 346, 110 S.Ct. at 2425–26.[4] Accordingly, the

3. The Militia Clauses authorize Congress:

[t]o provide for calling forth the Militia to execute Laws of the Union, suppress Insurrections and repel Invasions; [and]

\* \* \*

[t]o provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress[.]

U.S. CONST. art. I, § 8, cl. 15–16. The Armies Clause establishes Congress' authority "to raise and support Armies." U.S. CONST. art. I, § 8, cl. 12.

4. In *Perpich,* the Supreme Court examined the history of and enabling authority for the National Guard, explaining that:

[t]wo conflicting themes, developed at the Constitutional Convention and repeated in debates over military policy during the next century, led to a compromise in the text of the Constitution and in later statutory enactments. On the one hand, there was a widespread fear that a national standing Army posed an intolerable threat to individual liberty and to the sovereignty of the separate States, while, on the other hand, there was a recognition of the danger of relying on inadequately trained soldiers as the primary means of providing for the common defense. Thus, Congress was authorized both to raise and support a national Army and also to organize the Militia.

*Perpich,* 496 U.S. at 340, 110 S.Ct. at 2423–24 (footnotes omitted); *see also* Lt. Col. Steven B. Rich, *The National Guard, Drug Interdiction and Counterdrug Activities, and Posse Comitatus: The Meaning and Implications of "In Federal Service",* 1994–JUN ARMY LAW. 35, 37 ("The essential constitutional concept is that while Congress has certain powers and responsibilities regarding the militia, the selection of its officers and

National Guard and its infrastructure are frequently referred to as hybrid in character. *See, e.g., Johnson,* 780 F.2d at 388; *Williams v. Colorado Air Nat'l Guard,* 821 P.2d 922, 923 (Colo.Ct.App.1991).

At the Commonwealth level, pursuant to Article III, Section C of the Pennsylvania Constitution, the General Assembly has designated the Governor as commander-in-chief of the Pennsylvania National Guard, *see* 51 Pa.C.S. § 501, and required: supervision of the organization by the Adjutant General and the Department of Military and Veterans Affairs, *see* 51 Pa.C.S. §§ 701–02, 901–02; organization of personnel according to directives of the United States Department of the Army and Department of the Air Force, *see* 51 Pa.C.S. § 1102; and conformity of state regulation with all acts and regulations of the United States, *see* 51 Pa.C.S. § 103.

■ As the Commonwealth Court noted, Section 763(a)(1) of the Judicial Code confers upon it exclusive jurisdiction over direct appeals from Commonwealth agency adjudications— given that the Department was organized as a state executive agency, jurisdiction would appear facially to be present. In light of the unusual, dual character and function of PAARNG, however, in resolving the jurisdictional question the Commonwealth Court was correct to further assess whether Kise's service in the AGR was rendered in a state or federal capacity, and, similarly, the state versus federal status of the Department as concerns the separation action.

■ In this regard, we agree with the Commonwealth Court's conclusion that Kise functioned as a state soldier. In reaching this determination, the court properly invoked the applicable military regulation, AR–135–18, ch. 3–1.c, and corresponding legislative direction, H.R.Rep. No. 691, 98th Cong., 2d Sess. at 243, *reprinted in* 1984 U.S.C.C.A.N. at 4201–4202, which are explicit. *See supra* page 5; *accord Knutson v. Wisconsin Air Nat'l Guard,* 995 F.2d 765, 768 (7th Cir.1993) (describing a state adjutant general's separation action in

command and control remain with the states except during periods in the actual service of the United States.").

relation to an AGR officer as "the rather straightforward case of state officers exercising their state authority to effectuate the termination of state militia personnel"). While the Department presents arguments that might be deemed colorable in the absence of such express direction,[5] it is unable or unwilling to confront the designation by Congress and the United States Department of Army of AGR service as state service, since, despite the Commonwealth Court's explicit and central reliance on such authority, the Department makes no mention of it in the brief that it has submitted to this Court.[6]

 Similarly, we approve the Commonwealth Court's conclusion that the Department's separation action was accomplished by the Adjutant General in a state status. Although the Department of Military and Veterans Affairs and the Adjutant General, like the PAARNG itself, serve in both federal and state capacities,[7] we believe that it is consistent

5. The Department's contention, however, that an AGR soldier's dress in the federal uniform and receipt of payment from the federal government should be controlling is refuted in the cases and commentary. *See, e.g., Karr,* 746 F.Supp. at 1237; Rich, *The National Guard,* 1994–JUN ARMY LAW at 40 ("The issue of status depends on command and control and not on whether: state or federal benefits apply; state or federal funds are being used; the authority for the duty lies in state or federal law; or any combination thereof."). Although the Department fairly directs the Court's attention to *Commonwealth, Dep't of Military Affairs v. Greenwood,* 510 Pa. 348, 508 A.2d 292 (1986), as providing support for its position by way of analogy, such decision, arising in the state workers' compensation arena, did not involve an AGR soldier. Therefore, we do not deem it controlling here.

6. The Department does argue that categorization of AGR soldiers as state employees would violate the United States Constitution, which provides that "No State shall, without the Consent of Congress . . . keep Troops, or Ships of War in time of Peace . . . or engage in War, unless actually invaded, or in such imminent Danger as will not admit of delay." U.S. CONST. art. I, § 10, cl. 3. In absence of a constitutional challenge resolved by a tribunal of appropriate jurisdiction, however, we will not look beyond the clearly stated intent of the federal legislative and executive branches. *Cf. generally Perpich,* 496 U.S. at 347, 110 S.Ct. at 2426 (recognizing that the dual system of the federal and state National Guard program remains unchallenged).

7. *See, e.g., Hoffman v. Stump,* 1998 WL 869972, 172 F.3d 48 (6th Cir. Dec. 2, 1998) (table) (noting that a state adjutant general is a "hybrid federal and state official[ ]"); *Bowen v. Oistead,* 125 F.3d 800, 802 (9th Cir.1997); *Knutson,* 995 F.2d at 767.

with the federal design and the Commonwealth's scheme of implementation that the Department should be deemed to be acting in a state capacity in its administration of soldiers who are expressly designated as serving in a state status. *Accord Knutson,* 995 F.2d at 768.[8] Additionally, while the Department suggests that Section 763(a)(1) of the Judicial Code should be read to pertain only to matters arising directly under the Administrative Agency Law, the statute expressly confers jurisdiction in the Commonwealth Court over appeals from state administrative agency adjudications arising under that enactment "or otherwise." 42 Pa.C.S. § 763. Although the appeal touches on federal questions, as the Commonwealth Court correctly observed, the general rule is that state courts have concurrent jurisdiction over such issues, unless jurisdiction has been removed by Congress expressly, or by necessary implication. *See Testa v. Katt,* 330 U.S. 386, 393–94, 67 S.Ct. 810, 814–15, 91 L.Ed. 967 (1947). *See generally* 1 MOORE, FEDERAL PRACTICE P 0.6 at 230–40 (2d ed.1977). Accordingly, jurisdiction was proper in the Commonwealth Court.

We also agree with the Commonwealth Court that the Supremacy Clause of the United States Constitution, U.S. CONST. art. VI, cl. 2, preempts Pennsylvania's Administrative Agency Law to the extent that its requirement of a due process hearing is inconsistent with the separation procedure embodied in NGR 600–5. *Accord Bradley v. Stump,* 971 F.Supp. 1149, 1155 (W.D.Mich.1997), *aff'd* 1998 WL 385903, 149 F.3d 1182 (6th Cir. Jul. 1, 1998) (table); *cf. Coffman v. Michigan,* 120 F.3d 57, 58 (6th Cir.1997) (noting that state law remedies are not available to service members challenging internal military discipline decisions); *Hazelton v. State Personnel Comm'n,* 178 Wis.2d 776, 505 N.W.2d 793, 800–01 (Wis.Ct.App.1993) (holding that enforcement of a state em-

---

8. In this respect, AGR personnel should be distinguished from military technicians, who are expressly designated to be federal employees, and thus, would be subject to different jurisdictional prerequisites. *See, e.g., Lipscomb v. Federal Labor Relations Auth.,* 200 F.Supp.2d 650, 661 (S.D.Miss.2001) (finding that a state adjutant general acted in a federal capacity in the administration of personnel matters of National Guard technicians, who were federal employees); *Williams,* 821 P.2d at 924–25 (same).

ployment discrimination law in the National Guard arena was preempted by federal law). Significantly, federal preemption generally encompasses both federal statutes and regulations adopted in accordance with legislative authorization. *See City of New York v. Federal Communications Comm'n*, 486 U.S. 57, 63–64, 108 S.Ct. 1637, 1642, 100 L.Ed.2d 48 (1988). Thus, the Commonwealth Court was correct in narrowing the state appellate review in this case.

Additionally, in view of the generality of Kise's petition for review in its allegations concerning denial of fundamental due process, and its vagueness in terms of which procedures are claimed to have been inadequate, evaluation concerning the scope of state appellate jurisdiction is necessary. First, it is unclear whether and to what extent Kise claims that constitutional due process was lacking because he was denied a hearing prior to his separation, a claim that would effectively represent a challenge to the governing federal regulations since, as previously noted, these do not provide for a hearing. *See* NGR 600–5 ¶ 6–5.

 To the extent that Kise seeks to assert such a position, there are substantial questions concerning whether a direct appeal from a Commonwealth agency under Section 763 of the Judicial Code, contesting what is asserted to be a military personnel decision applicable to a National Guard member serving in a state capacity, is an appropriate vehicle by which to challenge the constitutionality of federal, military regulations. We recognize, as did the Commonwealth Court, the general rule that the state courts maintain concurrent jurisdiction to consider federal constitutional questions. Nevertheless, the present circumstances are unique in that, regardless of Kise's service in a state capacity, he must simultaneously maintain a federally recognized status to fulfill a role in the AGR—the regulations governing AGR service therefore touch not only upon active state military service but also readiness for national military service. To the extent that Kise intends to challenge the regulations, we find that the substantial entanglement of strong federal interests impedes state appellate review, particularly as the federal regulators

are not parties to the action, and jurisdiction over them cannot be gained by the Commonwealth Court in the absence of an express waiver by Congress of the national government's sovereign immunity, *see Department of Army v. Blue Fox, Inc.,* 525 U.S. 255, 261, 119 S.Ct. 687, 690, 142 L.Ed.2d 718 (1999). For purposes of any constitutional challenge to the federally prescribed procedures for involuntary separation of an AGR soldier, we conclude that an appropriate federal entity or authority is an indispensable party, and therefore, absent an express Congressional waiver of sovereign immunity, jurisdiction over such a claim does not lie in the courts of this Commonwealth. *Accord Sprague v. Casey,* 520 Pa. 38, 48–49, 550 A.2d 184, 189 (1988) (explaining that the absence of an indispensable party "goes absolutely to the court's jurisdiction").

Since the federal regulations establish a separation procedure that is not amenable to constitutional challenge in state court, and Kise's petition does not identify any local procedure established by the Department which might serve as the basis for heightened procedural protection, for purposes of the present, state court appeal, NGR 600–5 establishes the maximum process that was due Kise.

Additional jurisprudential concerns arise with regard to appellate review of the merits of the Adjutant General's separation decision. Ordinarily, review of a decision of a Commonwealth agency proceeds pursuant to Section 704 of the Administrative Agency Law, 2 Pa.C.S. § 704, which authorizes judicial review for constitutional compliance, adherence to applicable law and procedure, and record support for factual findings. There is tension, however, between the components of this review process and the procedures set forth in NGR 600–5 since, for example and as discussed, state court review for constitutional violations must be carefully limited to exclude challenges to the federal, military regulations. Further incongruity with traditional administrative review results from: the regulations' use of broad, open-ended concepts specific to military discipline such as "separation for cause," "inappropriate professional conduct," and "moral dere-

liction;" the lack of a requirement for a hearing or the creation of a record in the conventional sense; and the absence of any requirement for the Adjutant General to issue findings of fact and conclusions of law in support of a separation action. These characteristics, which we have determined are not subject to challenge in the state forum, further insulate the decision of the military establishment from state judicial review, since their consequence is to render unavailable various of the mechanisms by which state judicial review may be accomplished. The net effect is that the Commonwealth Court's review of a separation action involving an AGR soldier, where separation is accomplished in reliance on federal, military regulations and no supplemental state procedures are required or invoked, is effectively limited to the determination whether the Adjutant General adhered to the federally mandated procedures.[9] *Cf. C.J. v. Vuinovich,* 252 N.J.Super. 122, 599 A.2d 548, 553–54 (N.J.Super.Ct.App.Div.1991) (noting that state judicial intervention in a discharge and transfer from active duty to the standby reserve of HIV-positive member as required by federal regulations would be appropriate only if it was permitted by the federal regulations); *Hazelton,* 505 N.W.2d at 793 (*"Perpich* establishes the supremacy of Congress in the regulation of personnel criteria for the national guard[;][w]e conclude that the supremacy clause and the principles of preemption prevent the state from regulating personnel criteria of the national guard.").[10]

9. Other state courts have reached similar conclusions, albeit on different grounds. *See, e.g., Gough v. State,* No. 03–01–00358–CV, *slip op.,* 2002 WL 90930 (Tex.App. Jan.25, 2002) (not designated for publication) ("Because the Department complied with the requirements of amended Regulation 635–100, the doctrine of nonjusticiability precludes our further review of the Department's discretionary military decision discharging Gough."). We recognize, however, that some other courts may take a broader view of available, state court review. *See, e.g., State, Dep't of Military and Veterans Affairs v. Bowen,* 953 P.2d 888, 896 (Alaska 1998).

10. We need not address the Commonwealth Court's determination that Kise possessed a constitutionally protected interest in continuation in his AGR position, since, under the Administrative Agency Law judicial review is available not only for constitutional violations (where jurisdiction would be present), but also for compliance with applicable law, *see* 2 Pa.C.S. § 704, here the governing, federal regulations.

Although our decision here is predicated on jurisdictional and jurisprudential precepts applicable to state courts (or, to the extent that our Administrative Agency Law is unique, to courts of this Commonwealth), we note that various federal courts have concluded that their review of military personnel decisions is similarly constrained, either on grounds of nonjusticiability or based on the substantial deference owing to the military establishment in matters residing within the sphere of military expertise.[11] Such decisions arise in a landscape of two facially discordant lines of Supreme Court authority.[12]

11. See, e.g., Aktepe v. United States, 105 F.3d 1400, 1403 (11th Cir.1997) ("[t]he Supreme Court has generally declined to reach the merits of cases requiring review of military decisions, particularly when those cases challenged the institutional functioning of the military in areas such as personnel, discipline, and training."); Bradley, 971 F.Supp. at 1155 (observing that "[c]ourts regularly decline to hear lawsuits involving personnel actions integrally related to the military's unique structure") (quoting Mier v. Owens, 57 F.3d 747, 749 (9th Cir.1995)); Housman v. Baratz, 916 F.Supp. 23, 28 (D.D.C.1996) (observing that the court's deference to the military is at its highest "when the military, pursuant to its own regulations, effects personnel changes through the promotion or discharge process") (quoting Dilley v. Alexander, 603 F.2d 914, 920 (D.C.Cir.1979)); Heisig v. United States, 719 F.2d 1153, 1156 (Fed.Cir.1983) ("[R]esponsibility for determining who is fit or unfit to serve in the armed services is not a judicial province[.]"); Randolph v. Oklahoma Military Dep't ex rel. State, 895 P.2d 736, 741 (Okla.Ct.App. 1995) (expressing the view that inquiry into the National Guard's internal personnel decisions would interfere with military functions and involve the courts in the "sensitive area of military expertise and discretion") (quoting Costner v. Oklahoma Army Nat'l Guard, 833 F.2d 905, 908 (10th Cir.1987)); accord 6 C.J.S. ARMED SERVICES § 91 (2002) ("Judicial review of discharges of enlisted personnel is not available with respect to discretionary matters, but it may be utilized where the military authorities have exceeded their powers or failed to comply with regulations and procedures governing discharges.").

12. On the one hand, the United States Supreme Court has maintained that judicial review is available to ensure that the constitutional rights of armed services members are vindicated. See Winters v. United States, 89 S.Ct. 57, 60, 21 L.Ed.2d 80 (1968) ("A member of the Armed Forces is entitled to equal justice under law not as conceived by the generosity of a commander but as written in the Constitution and engrossed by Congress in our Public Laws."); See 6 C.J.S. ARMED SERVICES § 8 (Aug.2002) ("The judiciary has the [ability] to protect the constitutional rights of military personnel, and to prevent violations by military authorities of the Constitution, statutes, and military regulations."). On the other hand, the Court has substantially limited the availability of review based on the special relationship between the military and its personnel in light of its unique mission, see Chappell v.

*See generally Jones v. New York State Div. of Military and Naval Affairs*, No. 93–CV–0862, *slip op.*, 1997 WL 266765 (N.D.N.Y. May 7, 1997) ("For the federal courts, the question of justiciability in the realm of military matters has been a difficult one."); John Nelson Ohlweiler, *The Principle of Deference: Facial Constitutional Challenges to Military Regulations*, 10 J.L. & POL. 147, 148 (1993) (expressing the view that the Supreme Court "has not clearly articulated a standard as to how or when the military can restrict constitutional liberties"). In any event, our assessment concerning the available state appellate review ameliorates the justiciability and deference concerns related to the amenability of military decisions to judicial review that have generated controversy in the federal arena.[13]

On the merits of the appeal,[14] the provisions for involuntary

*Wallace*, 462 U.S. 296, 300–01, 103 S.Ct. 2362, 2365–66, 76 L.Ed.2d 586 (1983); separation of powers precepts, *see id.* at 301, 103 S.Ct. at 2366; *Orloff v. Willoughby*, 345 U.S. 83, 94, 73 S.Ct. 534, 540, 97 L.Ed. 842 (1953) ("Orderly government requires that the judiciary be ... scrupulous not to interfere with legitimate Army matters."), and, more specifically, the unique status of the military vis-à-vis the judicial system. *See Chappell*, 462 U.S. at 304, 103 S.Ct. at 2367–68. *See generally Gilligan v. Morgan*, 413 U.S. 1, 10, 93 S.Ct. 2440, 2446, 37 L.Ed.2d 407 (1973) (explaining that "it is difficult to conceive of an area of governmental activity in which the courts have less compe-tence[;][t]he complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments, subject always to civilian control of the Legislative and Executive Branches").

13. *See Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed.Cir.2002) (noting that courts are competent to review compliance with an applicable statute or regulation, for "[t]he military no less than any other organ of the government is bound by statute, and even when granted unfettered discretion by Congress the military must abide by its own procedural regulations should it choose to promulgate them."); *Adkins v. United States*, 68 F.3d 1317, 1323 (Fed.Cir.1995) (observing that a claim of procedural violations is subject to judicial review because "the test or standard against which this court measures the military's actions are inherent: they are the applicable statutes and regulations."); *Gough*, 2002 WL 90930, *1 ("It is well established that civil courts may review claims that military agencies failed to comply with their own regulations.") (citing *Hodges v. Callaway*, 499 F.2d 417, 419 n. 2 (5th Cir.1974)).

14. Although we have concluded that jurisdiction must be gained over a federal entity or authority for purposes of any constitutional challenge

separation for cause as set forth in NGR 600–5, paragraph 6–5, permit separation for, *inter alia,* inappropriate professional conduct and moral dereliction. *See* NGR 600–5 ¶ 6–5c. As a guideline, the regulations implicate counseling or reprimand prior to a commander's submission of a request for separation, subject to the proviso that counseling may be eliminated where it is unnecessary. *See id.* at ¶ 6–5a.(1). Various factors are delineated which may be considered in the commander's decision making, including: the seriousness of the underlying events or conditions; the likelihood of recurrence; the adverse impact on the member's fitness to serve and unit mission readiness; the member's military record; and the possibility of reassigning the member. *See id.* at ¶ 6–5a.(2). The separation recommendation is to be made by the commander or supervisor at the level commensurate with the AGR soldier's full-time duty position, *see id.* at ¶ 6–5b.(1), and the AGR soldier is afforded an opportunity to rebut, with the advice and assistance of Judge Advocate General's Corps counsel. *See id.* at ¶ 6–5b.(2), (3), (4). The recommendation is to proceed through command channels to the Adjutant General for final decision. *See* NGR 600–5 ¶ 6–5.

 Here, the recommendation that Kise be involuntarily separated from the AGR was initiated by Lieutenant Colonel David J. Griffith, Jr., Commander, Headquarters 28th Infantry Division (Mechanized), based on an investigation under Army Regulation 15–6. After interviews with Kise and other witnesses, the investigating officer found that Kise, a noncommissioned officer, engaged in extramarital, intra-service sexual encounters with females in his unit serving in ranks lower than his own; that this occurred while Kise was on and off duty; and that Kise made knowingly false statements during the course of the investigation of his conduct.[15] The

to the federal, military regulations governing involuntary separation of AGR soldiers, we will not extend this holding to claims merely seeking enforcement of the federal regulations against the Department acting in its state capacity, as such limited review is far less intrusive upon the federal military domain. *See generally supra* note 13.

15. We reiterate that the procedures pursuant to which the investigative officer made his findings are federally prescribed and uniquely military.

Commonwealth Court's opinion aptly summarizes the path of the investigative report through PAARNG's chain of command. *See Kise*, 784 A.2d at 260. At various stages in this process, it was acknowledged that Kise is a capable non-commissioned officer, but the conclusion was nonetheless maintained that the effect of his conduct on his unit's morale and ethical climate was too great to support his retention in a position of supervisory responsibility in the AGR. Pursuant to the regulations, Kise was provided with the report of the investigation and permitted to comment on it and LTC Griffith's recommendation.

The only specific complaint regarding this process that Kise presented in his petition for review was the assertion that he was denied an opportunity to participate in the investigation. This is belied, however, by the report of investigation, which reflects the investigating officer's interviews with him, and the written rebuttal that Kise was permitted to submit; moreover, the regulations do not establish any further, general participatory right. We also disagree with the Commonwealth Court's determination that the record must be supplemented by the Department to explain the reasoning supporting the decision to forego counseling, to identify applicable regulations and policies of which Kise was in violation, and to define the controlling standards of unprofessional conduct and moral dereliction. Rather, we hold that, in view of the character of the conduct adjudged by the military establishment to have occurred, the military's assessment of the impact of such conduct on unit readiness, Kise's position as a non-commissioned officer in an organization that is to be comprised of the most highly qualified and exemplary soldiers, and the procedures that were afforded in accordance with the military directives, the Adjutant General acted within the ambit of his discretion in this matter. A more exacting inquiry would exceed the limited breadth of our review, as described above.

Accordingly, and since our review entails only a determination of whether the Department complied with the applicable, federally mandated procedures, we do not assess the veracity of such findings.

The Commonwealth Court's order is reversed, and the case is remanded with directions that the underlying military personnel action be affirmed.

Justice NEWMAN files a dissenting opinion.

Justice NEWMAN, dissenting.

Although I agree with the ultimate result of the majority opinion, which affirms the underlying military personnel action, this congruence in outcome is purely coincidental. I write separately to articulate my opinion that review by this Court is inappropriate, as there is no jurisdiction and the matter is nonjusticiable.

My conclusion regarding lack of jurisdiction results from analyzing the state and federal roles of Appellee Galen Kise (Kise) and the Adjutant General (AG) and untangling the intertwined components of the Active Guard/Reserve (AGR) program in order to view their separate state and federal identities. I am compelled to address nonjusticiability, as well, based on United States Supreme Court precedent, which refuses to allow challenges to decisions of command, which, if permitted, "would involve the judiciary in sensitive military affairs at the expense of military discipline and effectiveness." *United States v. Shearer*, 473 U.S. 52, 59, 105 S.Ct. 3039, 87 L.Ed.2d 38 (1985).

In analyzing the jurisdictional issue, it is necessary to understand the nature of the National Guard. The National Guard is part of a "dual enlistment" system, where a guardsman simultaneously belongs to the National Guard of the United States and the National Guard of a particular state. "The Guard occupies a distinct role in the federal structure that does not fit neatly within the scope of either state or national concerns." *Knutson v. Wisconsin Air National Guard*, 995 F.2d 765, 767 (7th Cir.1993).

Under this "dual enlistment" system, guardsmen are state employees of their respective state National Guard units when they are not on active duty in the National Guard of the United States. *Kise v. Department of Military and Veterans*

*Affairs,* 784 A.2d 253, 255 (Pa.Cmwlth.2001) (internal citations omitted). The Department of Military and Veterans Affairs (DMVA), in its Brief of Appellant at 8–9, explains the five types of duty that a Pennsylvania National Guardsman can perform: (1) state active duty—pursuant to an emergency declaration or in anticipation of an emergency, the Governor may place the National Guard on active duty. The Commonwealth then controls and funds their activities, pursuant to 51 Pa.C.S. § 508; (2) special state active duty—the Governor may place or delegate authority to the AG to order volunteer members of the National Guard on special state duty "to respond to community needs, support Commonwealth functions, support federal, state and local drug eradication and interdiction operations and perform other necessary military duties to the extent funds are available." This is state funded status authorized by 71 P.S. § 391e; (3) Title 10 (federal) status—this is when the President activates the National Guard for call-up, such as Operation Desert Shield. This duty is subject to the exclusive control of the federal government. This duty preempts any state duty; (4) Title 32 status—this is a drilling member of the National Guard, who is compensated by the federal government as a reserve component of the Armed Forces of the United States. It is subject to the control of the AG and the Governor, but it is federal status pursuant to 32 U.S.C. § 502; (5) AGR status—full-time active duty by a member of the National Guard; subject to day-to-day control of the AG but federal in status, federally reimbursed and regulated, and authorized by 32 U.S.C. § 502. Prior to his dismissal, Kise was on full-time active duty as a member of the AGR of the National Guard and was an enlisted member in the Pennsylvania National Guard. His termination from the AGR did not affect his status in the Pennsylvania National Guard.

This AGR program is instituted, administered by and subject to the direction of the federal government. Kise was terminated from this, his full-time position, for an improper sexual relationship, involving inappropriate professional conduct and moral dereliction, attributes that could not be tolerat-

ed in his position of supervisory authority in the special AGR program.[1]

The majority finds jurisdiction based on its conclusion that Kise was a state employee at the time of his discharge and that the AG acted in his state capacity when he terminated Kise. However, this is wrong, and the facts support the opposite conclusion, given the complex intertwining of state and federal roles in the Pennsylvania National Guard and AGR programs. As aptly characterized by the DMVA, Kise was a federal soldier, and the AG acted in his federal capacity.

The DMVA does not deny that many jurisdictions regard AGR duty pursuant to 32 U.S.C. § 502 as "state duty." However, this classification likely results from the confusion surrounding AGR status, and the fact that a Pennsylvania Guardsman can wear as many as five different hats. AGR status is defined as Army National Guard personnel serving on "full-time National Guard duty." 10 U.S.C. § 101(d)(6)(A). Although subject to the day-to-day administrative control of the AG, it is federal in nature, and Guardsmen in that category are prohibited from serving either state active duty or special state active duty.

The majority points to a military regulation and legislative history reflecting that AGR service is performed under the control of state National Guard authorities, rather than the federal government. The majority believes that were it not for this regulation and legislative history, the DMVA's arguments "might be colorable." The majority is incorrect; neither the legislative history nor the regulation answers the question *sub judice.*

The legislative history reflects only that personnel in full-time National Guard service are under control of state National Guard authorities and are not subject to the restrictions of the Uniform Code of Military Justice (UCMJ) or the Posse

---

1. The separation notice sent to Kise stated "[y]our lack of honesty, sound judgment and moral dereliction is not in keeping with the values and ethics expected of a professional soldier. Values are what soldiers, as a profession, judge to be right. They are moral, ethical and professional attributes of character." *Kise,* 784 A.2d at 265, n. 23.

Comitatus Act.[2] 1984 U.S.C.C.A.N. 4174, 4201–4202. Persons subject to the UCMJ include "members of a reserve component while on inactive-duty training, but in the case of members of the Army National Guard of the United States or the Air National Guard of the United States only when in Federal service." 10 U.S.C. § 802(a)(3).

Thus, AGR personnel are exempt from the restrictions of the UCMJ, and the UCMJ recognizes that National Guard members are sometimes in federal service and other times not. In my view, this does not warrant the conclusion of the majority—that Kise was a state employee who was terminated by the AG, acting in his state capacity. Rather, it provides support for the determination that there is no jurisdiction.

The AGR program is federally reimbursed, federally regulated, and authorized by federal law at 32 U.S.C. § 502. Kise was paid by the federal government, wore a United States Army uniform, was subject to the direction and control of the military, was investigated pursuant to Army regulation, and was dismissed by the AG pursuant to a purely federal regulation.

While the majority chooses to focus on the state aspects of the duties of Kise and the AG, it has not been able to surmount the obstacle to jurisdiction that Judge Pellegrini raised in his dissenting opinion in *Kise*, which was joined by Judge Leadbetter. The dissenters made an absolute and strong statement when they concluded that:

> the investigation into Kise's misconduct was conducted pursuant to the provisions of a Department of Army regulation ... This is relevant because, not only is there evidence that this is a federal matter, but *regardless of what this court orders, we cannot force the federal government to pay for or approve Kise's active duty status. Courts should not enter orders they cannot enforce.*

*Kise*, 784 A.2d at 266 (emphasis added).

Although I determine that we lack jurisdiction to hear this case, I believe that it is important to articulate my opinion that

**2.** 18 U.S.C.A. § 1385 (prohibits use of Army or Air Force military personnel in civilian law enforcement).

this matter is nonjusticiable. The United States Supreme Court describes nonjusticiability as inappropriateness of the subject matter for judicial consideration. *Baker v. Carr,* 369 U.S. 186, 198, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). In *Baker,* the Court stated "that in the instance of nonjusticiability, consideration of the cause is not wholly and immediately foreclosed; rather, the Court's inquiry necessarily proceeds to the point of deciding whether the duty asserted can be judicially identified and its breach judicially determined, and *whether protection for the right asserted can be judicially molded." Id.* at 198 (emphasis added).

In the instant case, Kise challenges termination from his federally salaried position in the AGR. His termination was initiated and implemented pursuant to federal regulation. As the Commonwealth Court recognized, the due process rights of Pennsylvania's Administrative Agency Law are not implicated, and Kise's challenges go to the application of the federal regulation.[3] As the Commonwealth Court dissent correctly noted, even if we determined that Kise's termination was improper, we could not require the federal government to pay his salary or to reinstate his AGR status. This fact renders the matter nonjusticiable, for the third prong of *Baker,* that protection can be judicially molded, cannot be achieved. Because we cannot order the federal government to reinstate Kise to the AGR and pay him his salary, we cannot effectuate a judicial remedy, and the matter is nonjusticiable.

The majority recognizes that the AGR is comprised of the most highly qualified and exemplary soldiers whose purpose is to provide officers and enlisted personnel to support the National Guard and Army Reserves, generally in positions related to organizing, administering, recruiting, instructing or training. Given the special nature of the AGR program and the military's determination that Kise was unfit to serve in it, we should not interfere with the decision to terminate him.

3. Kise contends that the AG abused his discretion by failing to address certain "mandatory" factors; that his commander failed to counsel; that the sufficiency and competency of the evidence are in question; and that the rules of fraternization did not apply to his sexual relationship with another soldier who was not in his chain-of-command.

Our jurisprudence has long expressed that "judges are not given the task of running the Army." *Orloff v. Willoughby*, 345 U.S. 83, 93, 73 S.Ct. 534, 97 L.Ed. 842 (1953). The majority cites the United States Supreme Court, which said, "it is difficult to conceive of an area of governmental activity in which the courts have less competence. The complex subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments, subject always to civilian control of the Legislative and Executive Branches." *Gilligan v. Morgan*, 413 U.S. 1, 10, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973). While not every action or decision of the military is nonjusticiable, the issue *sub judice* is inappropriate for judicial review. *See, Shearer*, 473 U.S. 52, 58, 105 S.Ct. 3039, 87 L.Ed.2d 38 (claim against Army under the Federal Tort Claims Act barred because "[t]o permit this type of suit would mean that commanding officers would have to stand prepared to convince a civilian court of the wisdom of a wide range of military and disciplinary decisions; for example, whether . . . to discharge a serviceman . . .)."

The majority asserts that its determination "ameliorates the justiciability and deference concerns related to the amenability of military decisions to judicial review. . . . It describes its review as a limited review [which] is far less intrusive upon the federal military domain." However, I believe that the matter is nonjusticiable, and review of any degree is precluded. The majority's characterizing the review as less intrusive does not eradicate the harm that it causes by injecting itself into the militarys investigative process.[4]

The case *sub judice* illustrates perfectly the terrain on which this Court should not tread. The decision to terminate Kise resulted from the strategic importance of the AGRs mission, as well as the attributes demanded of its members. The courts are not equipped to evaluate the subjective wisdom

4. Because the matter is nonjusticiable, the adequacy of the record is irrelevant. Nevertheless, I note that the majority has conducted its review and made its conclusions based on a record that the Commonwealth Court determined was inadequate.

of particular military judgments. "[C]ivilian courts may not sit in plenary review over intraservice military disputes.... [T]here can be little doubt that the permissible range of lawsuits by present or former servicemen against their superior officers is, at the very least, narrowly circumscribed." *Farmer v. Mabus*, 940 F.2d 921, 924 (5th Cir.1991), *cert. denied*, 502 U.S. 1058, 112 S.Ct. 935, 117 L.Ed.2d 107 (1992) (internal citations omitted). Although *Farmer* held that a dispute involving the AG and Governor was not justiciable in federal court, its reasoning is relevant to Kise's appeal. In *Farmer*, the district court reached the merits of a dispute between the governor and the AG, where the governor removed the AG's federal and state authority to oversee the day-to-day operations of the Mississippi National Guard. On appeal, the court found the case nonjusticiable, describing the issue as:

> little more than a direct attack on a personal order of the [governor]. While the courts occasionally have been willing to examine the lawfulness of induction or discharge, decisions internal to the chain of command require much greater deference, lest we soon find ourselves mired in the nigh-impossible task of judicially reviewing each order or directive issued by lawful military authority.

*Id.* at 924 (internal citations omitted).

The Commonwealth Court dissent at *Kise*, 784 A.2d at 266, expresses my opinion succinctly: "[T]he National Guard is being prepared to wage war, involving killing and dying. If the military believes that [Kise] should not serve, we should not interfere."